UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
JERMAINE LAMB,

                                    *Plaintiff,*

        -against-                                                    **COMPLAINT**

NEW YORK STATE DEPARTMENT OF                        Jury Trial Demanded
CORRECTIONS & COMMUNITY SUPERVISION,
COLLIER, CORRECTION OFFICER HOLLAND, CORRECTION          Case No.: 9:26-cv-147  BKS/ML
OFFICER MOHN, CORRECTION OFFICER MORRIS,
CORRECTION OFFICER BUZZELLI, SERGEANT KOEPF,
REGISTERED NURSE NICHOLS, REGISTERED NURSE #299,
CORRECTION OFFICERS JOHN/JANE DOES # 1-5 AND
MEDICAL STAFF JOHN/JANE DOES #6-10

                                    *Defendants.*
-------------------------------------------------------------------X

        Plaintiff JERMAINE LAMB, by and through his attorneys, Ellie Silverman Law P.C., as and
for his Complaint alleges as follows:

## PRELIMINARY STATEMENT

        1.      Plaintiff JERMAINE LAMB brings this action against Defendants for the violation of
his civil rights while he was incarcerated at Attica Correctional Facility ("Attica" or "the Prison")
and under the care and custody of Defendant NEW YORK STATE DEPARTMENT OF
CORRECTIONS AND COMMUNITY SUPERVISION (hereinafter "DOCCS" or "the
Department").

        2.      On the evening of January 28, 2023 and continuing through January 29, 2023[1], Plaintiff
was housed on the Residential Crisis Treatment Program/Mental Health Unit ("RCTP" or "MHU",
respectively) for mental health observation after experiencing suicidality.

        3.      On the RCTP, incarcerated individuals are locked behind plexiglass and kept in a
smock, unable to wear any clothes or undergarments.

        4.      A camera is in their cell, recording their every bowel movement, they cannot use
bedding, have none of their personal property, and they must ask for toilet paper every time it is
needed.

---

[1] In Plaintiff's Court of Claims case for the aforementioned incident, Plaintiff reported the date to be either January 28,
2023, January 29, 2023, January 30, 2023 or January 31, 2023. In Plaintiff's Bill of Particulars, Plaintiff reported the date
to be January 28, 2023. This inconsistency is due to the Department's failure to timely respond to Plaintiff's multiple
requests under the New York Freedom of Information Law, Public Officers Law, Article 6, §§ 84-90 ("FOIL"). To date,
based on the records in Plaintiff's possession - this incident occurred on January 28, 2023 or January 29, 2023.

5. This forces the incarcerated individual to rely solely and completely on correction officers for their daily needs.

6. While Plaintiff was in this incredibly vulnerable state and experiencing a mental health crisis, Defendants brutally assaulted him, resulting in physical trauma and surgery.

7. Plaintiff seeks justice for Defendants' deliberate violations of his civil and constitutional rights. This lawsuit demands accountability for the Defendants' senseless actions, and damages for the catastrophic injuries they caused.

## JURISDICTION AND VENUE

8. This action is brought pursuant to 42 U.S.C. § 1983 for violations of rights secured by the Fourth, Eighth and Fourteenth Amendments to the United States Constitution.

9. This court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343.

10. Venue is proper pursuant to 28 U.S.C. § 1391 in the Northern District, which is the judicial district where the events giving rise to this complaint took place.

## JURY DEMAND

11. Plaintiff demands a trial by jury in this action on each of his claims for which a jury trial is legally available.

## THE PARTIES

12. Plaintiff JERMAINE LAMB is a citizen of the United States and of the State of New York. At all times relevant to this complaint, he resided in the State of New York.

13. Defendant NEW YORK STATE DEPARTMENT OF CORRECTIONS & COMMUNITY SUPERVISION maintains, oversees and is responsible for Attica. Acting through the State of New York, the Department is authorized to maintain correctional facilities and is responsible for maintaining and supervising correctional facilities in the State of New York. The Department assumes the risks incidental to the maintenance of correctional facilities and the employment of correctional officers and medical officials under its employ.

14. DOCCS is a public entity bound by both Title II of the American with Disabilities Act ("ADA") and the Rehabilitation Act of 1973.

15. DOCCS is responsible for ensuring that people sentenced to a term of imprisonment in a State correctional facility receive appropriate care and services required by law.

16. Defendants COLLIER, HOLLAND, MOHN, MORRIS, and BUZZELLI worked at all relevant times as New York State Correction Officers at Attica. They are sued here in their individual capacities.

17. Defendant KOEPF worked at all relevant times as a New York State Sergeant at Attica.

2

He was the Area Supervisor on January 28, 2023. He is sued here in his individual capacity.

18.    Defendants JULIE NICHOLS and Nurse #299 worked at all relevant times as New York State medical providers, upon information and belief, registered nurses at Attica. They are sued here in their individual capacities.

19.    Defendants are referred to collectively in this complaint as "the individual Defendants."

20.    At all relevant times, Correction Officer JOHN/JANE DOES # 1-5 and Medical Staff JOHN/JANE DOES # 6-10 are sued in their individual capacities and are referred to as CO DOES and Medical Provider DOES, respectively.

21.    At all relevant times, the individual Defendants were employed by the State of New York and/or DOCCS and acted under color of law and in the course and scope of their duties and authority as officers, agents, servants, and employees of the State of New York and/or DOCCS. Accordingly, they are entitled to representation in this action by the New York State Attorney General's Office upon their request.

22.    As officials employed by DOCCS, acting under the color of law in the course and scope of their duties and authority, the individual Defendants were responsible for not violating the incarcerated individuals' rights under 42 USC § 1983.

23.    As officials employed by DOCCS, a public entity bound by both Title II of the ADA, the Rehabilitation Act of 1973 the individual Defendants were responsible for recognizing when incarcerated individuals display signs of medical and mental health emergencies and for taking appropriate measures to ensure that incarcerated individuals in such distress receive immediate medical and mental health attention.

24.    As officials employed by DOCCS, a public entity bound by The Civil Rights Act of 1871, the individual Defendants had a responsibility to not discriminate against Plaintiff based on race.

25.    As officials employed by DOCCS, a public entity bound by the Constitution of the United States, a government may not retaliate against individuals for exercising their rights under the First Amendment.

26.    Upon information and belief, the individual Defendants are citizens of the United States and citizens and residents of the State of New York.

27.    At all relevant times, the individual Defendants violated clearly established constitutional rights, of which a reasonable person operating in their position would have known and corrected.

28.    The conduct of the individual Defendants caused Plaintiff to suffer from mental and physical anguish.

29.    The conduct of the individual Defendants caused Plaintiff to suffer violations of his constitutional rights.

**STATEMENT OF FACTS**

30.    Plaintiff realleges and incorporates by reference each allegation set forth in the foregoing paragraphs as if fully set forth herein.

31.    Plaintiff's Mental Health Service Level ("MHSL") was 2, as determined by the Office of Mental Health ("OMH"), which is defined by OMH as requiring mental health attention on a full-time basis due to the diagnosis of a major mental disorder.

32.    Per OMH records, Plaintiff had begun receiving Haldol on December 28, 2022 as a result of his mental health condition.

33.    Further, at the time of this incident, Plaintiff's primary diagnosis was Post-traumatic Stress Disorder.

34.    Therefore, according to New York State Executive Law § 296(2), Plaintiff was an individual with a disability at the time of the incident.

35.    Further, at the time of this complaint, Plaintiff's mental health condition had so limited his day-to-day activities that he had to be confined under 24 hour observation on a special OMH satellite unit; OMH had a clear record of his mental health condition; and he was regarded by OMH and DOCCS staff as having such an impairment.

36.    Therefore, Plaintiff qualifies as an individual with a disability under the ADA.

37.    Prior to the events that are relevant to the allegations in this complaint, Plaintiff had been submitting grievances for not being permitted to go outside during recreation and complained that generally, he was in fear for his life.

38.    In the days and months leading up to the allegations in this complaint, Plaintiff believed he was being retaliated against by officers at Attica based on the assault he suffered previously at a different facility.

39.    In the days leading up to the events relevant to this complaint, Plaintiff had a mental health emergency and was transferred to the RCTP on January 25, 2023.

40.    Plaintiff was participating in a hunger strike at the time, which required the presence of a medical practitioner at Plaintiff's cell during mealtimes, in order to memorialize in writing notes of Plaintiff's refusal of food and medication.

41.    Additionally, there is no clock in this particular cell, a bright light shining at all times of day and night and Plaintiff was not eating or taking his medication for approximately four to five days.

42.    By protocol, a correction officer was required to constantly monitor Plaintiff via frequent rounds on the unit and via the mounted cameras aimed directly into each MHU cell.

4

43.    This officer was cursing at Plaintiff, getting upset when he was refusing his meal trays and stating that he was very aggravated that he had to do this additional work.

44.    On January 28, 2023, during this evening dinner time, despite this monitoring and refusing all his meals while on the RCTP, Plaintiff attempted to commit suicide by swallowing/attempting to swallow a "rubber spoon,"[2] or a piece of orange plastic that appeared to be a spoon, which caused him breathing problems and to cough up blood.

45.    Plaintiff reported this to the officers on duty–Defendants MORRIS and MOHN, as well as BUZZELLI and DOE–who became very angry and initially refused to bring him to medical.

46.    In response, Plaintiff covered the mounted camera in his cell in an attempt to receive the appropriate care.

47.    The officers on duty the evening of January 28, 2023 including the officer that was previously handing out dinner trays, pushed Plaintiff against the cell wall and inserted a plastic spoon up his rectum while telling him: "so you want to play with spoons? .[3]

48.    Defendant KOEPF then directed Defendant MOHN to escort Plaintiff to medical at or about 6:55p.m.

49.    Plaintiff met with a medical provider (either Nurse #88 or #89, per the Ambulatory Health Progress Note) on January 28, 2023 at approximately 7:15pm, to whom he explained his suicidality and claimed that he swallowed or attempted to swallow a "rubber spoon."

50.    This nurse advised Plaintiff to monitor his own bowel movements for the spoon and he returned to his RCTP cell, MHU-8.

51.    Plaintiff continued to suffer mentally and physically and refused to remove the obstruction from the camera in his MHU cell.

52.    Resultantly, Plaintiff was placed on 1:1 watch, because he could no longer be monitored via his camera.

53.    As a result, Defendant MORRIS–among Defendants CO DOES–who was monitoring him on 1:1 watch at the time on January 29, 2023, had to work overtime.

54.    Defendants COLLIER, HOLLAND, MOHN and CO DOES then entered Plaintiff's cell, assaulted him, handcuffed him, and pushed him against the wall. Defendants then inserted a plastic spoon in Plaintiff's rectum while telling him: "so you want to play with spoons?"[4]

---

[2] In accordance with DOCCS Directive #4101, when held on an OMH Satellite Unit such as the RCTP, incarcerated individuals must eat with either a "flex spoon" or an "eco security utensil," as approved by medical or the OMH Unit Chief. Further, the use of such utensils must be documented in the Unit Activity Logbook, as the utensils must be returned following each use.

[3] Alternatively, the abuse occurred on January 29, 2023 (see par. 54). The CPLR explicitly permits alternative pleading, see CPLR § 3014; Gray Line New York Tours, Inc. v. Big Apple Moving & Storage, Inc., 140 A.D.3d 478 (1st Dept. 2016).

[4] Alternatively, the abuse occurred on January 28, 2023 (see par. 47). The CPLR explicitly permits alternative pleading, see CPLR § 3014; Gray Line New York Tours, Inc. v. Big Apple Moving & Storage, Inc., 140 A.D.3d 478 (1st Dept. 2016).

55.     This assault was not sexual in nature–in the sense of not being performed solely for personal gratification–instead, it was in furtherance of the Defendants agenda to send a message to Plaintiff while allegedly maintaining order in the prison.

56.     The individual Defendants and Defendants CO DOES told Plaintiff that he deserved this for causing such an "inconvenience."

57.     On January 31, 2023, Plaintiff was escorted to the facility's hospital, where Defendants JULIE NICHOLS and Nurse #299 attended to his injuries in an exam room.

58.     Defendant JULIE NICHOLS examined Plaintiff's anus and Defendant Nurse #299 documented that they believed Plaintiff's description of the abuse to be false.

59.     Their medical opinions were proven false by Plaintiff's providers at Wyoming County Community Hospital.

60.     One can only assume that Defendants JULIE NICHOLS and Nurse #299 were fabricating or otherwise undermining his report in order to cover-up the abuse.[5]

61.     Defendants JULIE NICHOLS and Nurse #299's behavior also indicates a disbelief of his story due to his mental health diagnoses and disabilities.

62.     In an attempt to get proper medical attention, Plaintiff advised Dr. David Williams–a provider employed at Attica–that he could still feel the spoon he "swallowed" in his chest. A chest x-ray conducted at the facility was negative for any foreign bodies.

63.     Upon Dr. David Williams' referral, Plaintiff was transported to Wyoming County Community Hospital where he received further, unbiased medical assistance and underwent surgery on February 1, 2023, which was performed in order to remove the plastic spoon from his rectum.

64.     Medical providers at Wyoming County Community Hospital determined that Plaintiff was experiencing rectal bleeding. An abdominal x-ray was negative for a foreign body.

65.     Plaintiff then underwent an upper endoscopy, which determined that as of this date, there was no ingested foreign body and no apparent trauma indicating any ingested foreign body.

66.     Dr. Theodore C. Ondracek diagnosed him with peptic duodenitis, unrelated to this incident.

67.     Plaintiff then underwent a digital rectal examination, demonstrating the presence of a foreign body.

---

[5] Some DOCCS medical providers are complicit in abuses against incarcerated people by correction officers by directly allowing assaults, witnessing them and/or helping cover them up. *See* Restrained, Beaten, Asphyxiated: New York Prison Guards' Brutality Grows - The New York Times *- see also,*
https://www.themarshallproject.org/2025/04/30/new-york-prisons-abuse-infirmaries;
https://www.nytimes.com/2025/12/31/nyregion/ny-prison-deaths-beatings-brooks-nantwi.html;
https://www.nytimes.com/2025/11/05/nyregion/ny-prison-beating-lawmaker.html; and
https://www.nytimes.com/2025/11/24/nyregion/ny-prison-guards-abuse-brutality.html.

68.    Plaintiff next underwent a rectal endoscopy, when the foreign body was removed from his rectum.

69.    Upon information and belief, Plaintiff's doctor determined that Plaintiff must have already passed the alleged rubber spoon and that this was not the spoon Plaintiff could have swallowed.

70.    Plaintiff's surgeon determined and documented the foreign body to be a plastic spoon and found traumatic rectal erosions and hemorrhoids *prior* to the removal of the plastic spoon.

71.    The trauma to his anus therefore could not have been caused by the removal of the plastic spoon itself.

72.    When an incarcerated individual is on the RCTP, the Department gives them a "flex spoon" or an "eco security utensil," both made of rubber, in order to try and avoid instances of self-harm.  Plaintiff therefore could not have swallowed the plastic spoon found in his rectum, as he was unable to be in possession of such a spoon.[6]

73.    Plaintiff continues to be in fear and under threat of imminent attack despite being transferred out of Attica to other DOCCS facilities.

74.    Defendant knew or should have known that the individual Defendants and Defendants CO DOES had a propensity for violence and knew that Plaintiff was under threat of attacks especially given the circumstances.

75.    DOCCS correction officers retaliated against Plaintiff because of the prior complaints made against them or their fellow officers.[7]

76.    Plaintiff, in a serious mental health crisis under invasive and intensive monitoring and with well-documented serious mental illnesses including suicidality, was wiping feces on the walls of his MHU cell, refusing to eat–leading to paperwork and more monitoring and staff involvement–and had recently covered the camera in his cell on January 28, 2023, requiring 1:1 watch and even more monitoring and staff involvement, work, paperwork and overtime.

77.    Defendant DOCCS' Office of Special Investigations ("OSI") failed to properly investigate Defendants' abuse of Plaintiff and their deliberate indifference to Plaintiff's well being and medical needs, further covering up the incident and protecting the abusive behavior of its staff.

78.    Despite Plaintiff's disturbing report, DOCCS OSI did not properly or adequately investigate the complaint.

79.    DOCCS OSI documented in their investigatory reports both January 28, 2023 and

---

[6] Further, even if Defendants believe that this was the spoon that Plaintiff allegedly swallowed, as Plaintiff had not yet passed the spoon when they were discovered, these rectal erosions must have been caused by the violent insertion of a foreign body into his anus.

[7] *See* https://static1.squarespace.com/static/62f1552c1dd65741c53bbcf8/t/651ec66e5505c5122ed0154a/1696515700783/CANY _GrievanceReport_2023Oct.pdf

January 31, 2023 as potential incident dates, yet only reviewed video footage from January 28, 2023.

80.    Either Defendant DOCCS overlooked the fact that the incident could've occurred on another day, unilaterally decided to protect the individual Defendants, Defendants CO DOES and Defendants Medical Provider DOES, and/or discriminated against Plaintiff due to his mental health condition.

81.    According to DOCCS OSI records, the video footage from January 28, 2023 led Defendant DOCCS to determine that Plaintiff's complaint was unfounded.

82.    However, this conclusion by DOCCS is inappropriate as it did not extend the review past that time period despite the fact that it very possibly occurred on January 29, 2023.

83.    Further, Defendant DOCCS interviewed Plaintiff during the course of its investigation, during which interview Plaintiff stated that he had been in the RCTP for a few days without any access to a time-telling device (such as a calendar or clock), but that the abuse occurred around dinner time (when sloppy joes were served) the day before he filed his OSI complaint and while he was on 1:1 watch *after* he had covered his camera.

84.    The event occurred after he had swallowed and/or attempted to swallow the rubber spoon, which is documented to have been reported at approximately 6:40pm January 28, 2023.

85.    Plaintiff reported the incident to DOCCS OSI on January 31, 2023.[8]

86.    Plaintiff made it clear during his DOCCS OSI interview that the incident in question occurred after he was placed on 1:1 watch for covering his camera – and this 1:1 watch did not begin until approximately 7:40pm on January 28, 2023.

87.    Defendant DOCCS documented that it reviewed video footage from January 28, 2023 of Plaintiff around dinner time up until he was brought to medical at approximately 6:55pm – and no other video tape was reviewed including past that time and into January 29, 2023.

88.    Defendant DOCCS had absolutely no reason to not review video footage around dinner time from each possible day, or throughout the entire evening on January 28, 2023.

89.    Allegations that its staff had sexually abused an incarcerated individiual–someone vulnerable and in serious crisis, in fact–should have been investigated to the fullest possible extent.

90.    Plaintiff provided them with potential dates, factors that had to be met, yet Defendant only investigated a two to three hour time frame.

91.    Defendant DOCCS provided Plaintiff with the video footage it reviewed during its investigation. No officer is seen doing a 1:1 watch of Plaintiff's cell.

92.    Further, the footage is timestamped the date and time it was pulled for review.

---

[8] In Plaintiff's personal investigation, it was determined that Plaintiff was moved from the RCTP on January 30, 2023, and therefore the attack could not have occurred on said date. Defendant DOCCS made no effort to investigate whether January 29, 2023 was the date – there is no documentation.

93.     Plaintiff was subjected to extreme abuse due to a symptom of his serious mental illness, which violates the Americans with Disabilities Act, the Rehabilitation Act, New York State law and the US Constitution.

94.     Defendants failed to provide adequate medical treatment in a timely fashion after Plaintiff was assaulted and failed to provide the necessary follow-up care, including but not limited to delaying Plaintiff's transport to the outside hospital until at least 2 days following the incident and delayed Plaintiff's medical attention from January 28, 2023 through February 1, 2023, despite facility-level medical staff deeming his injuries mandating emergency care. Notably, had Plaintiff been adequately and timely transferred to medical attention, this incident would not and could not have happened.

95.     As a direct and proximate result of the deprivation of his constitutional rights, Plaintiff JERMAINE LAMB suffered the injuries and damages set forth above.

## FIRST CAUSE OF ACTION
### 42 U.S.C. § 1983 (Excessive Force, Violation of Due Process & Right to Be Free From Cruel & Unusual Punishment)

96.     Plaintiff realleges and incorporates by reference each allegation set forth in the foregoing paragraphs as if fully set forth herein.

97.     Defendants used excessive and unconstitutional force against Plaintiff and/or had the opportunity to but failed to intervene to stop the use of excessive and unconstitutional force against Plaintiff.

98.     The use of force against Plaintiff was done maliciously and sadistically and constituted cruel and unusual punishment.

99.     Here, the conduct is so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience. *See* Velez v. Levy, 401 F.3d 75, 93 (2d Cir. 2005).

100.    Defendants' wrongdoings described above in the Plaintiff's Statement of Facts, which caused Plaintiff to suffer physical injury(ies), amounted to excessive force in violation of the Constitution.

101.    Here, Defendants satisfy the subjective prong that Defendants acted in bad faith and that the actions, as described above, violated the standards of decency.

102.    Defendants failed to protect Plaintiff from the conditions that posed a substantial risk of harm and were aware of the risks to Plaintiff's health and safety and disregarded these substantial risks of harm.

103.    The use of force against Plaintiff was done maliciously and sadistically and constituted cruel and unusual punishment.

104. The unlawful conduct of Defendants was willful, malicious, oppressive and reckless and was of such a nature that punitive damages should be imposed.

105. Defendants' conduct was entirely unjustified and their actions constituted excessive use of force.

106. Defendants deprived him of his rights under the Eighth Amendment when they threatened him so severely that he was significantly physically and psychologically injured.

107. Defendants by unjustifiably attacking the Plaintiff and their actions in the aftermath of the attacks, violated Plaintiff's right to be free from punishment and deprivation of life and liberty without due process of law and to be free from deliberate indifference to those rights.

108. The use of force was not in an effort of good faith to restore discipline, but rather was used maliciously and sadistically to hurt Plaintiff.

109. In committing the acts and omissions complained of herein, Defendants acted under color of state law to deprive Plaintiff of his constitutionally protected rights under the First, Eighth, Fourth and Fourteenth Amendments to the United States Constitution.

110. The unlawful conduct of Defendants was willful, malicious, and oppressive and was of such a nature that punitive damages should be imposed.

111. As a direct and proximate result of the deprivation of his constitutional rights, Plaintiff JERMAINE LAMB suffered the injuries and damages set forth above.

### SECOND CAUSE OF ACTION
**42 U.S.C. § 1983 (Deliberate Indifference to**
**a) Serious Medical Needs and –**
**b) Safety including Failure to Protect/Unconstitutional Conditions of Confinement)**

112. Plaintiff realleges and incorporates by reference each allegation set forth in the foregoing paragraphs as if fully set forth herein.

113. As described in the Plaintiff's Statement of Facts, there were unreasonable risks to Plaintiff in general and also personal risks.

114. Here, Plaintiff's deprivation of rights throughout this extended experience or sequence of events was sufficiently serious. Moreover, the deliberate indifference was so sufficiently serious that a reasonable person in Defendants' positions would perceive that treatment was worthy and, in many cases throughout this experience, necessary.

115. In addition to Defendants directly participating in the deprivations, Plaintiff also spoke at several different times and told Defendants exactly what was wrong or what his issue was at the specific moment.

116. In committing the acts and omissions complained of herein, Defendants acted with deliberate indifference to Plaintiff's serious medical needs.

117.    In committing the acts and omissions complained of herein, Defendants enabled and ignored Defendants attacks on Plaintiff in the MHU, either with malice or with negligence.

118.    In committing the acts and omissions complained of herein, Defendants acted with deliberate indifference to Plaintiff's serious medical needs.

119.    In committing the acts and omissions complained of herein, Defendants acted with deliberate indifference to Plaintiff's serious medical needs when they denied him medical attention and treatment.

120.    In committing the acts and omissions complained of herein, Defendants acted under color of state law to deprive Plaintiff of his constitutionally protected rights under, among other rights - the Eighth Amendment to the United States Constitution.

121.    As a direct and proximate result of the deprivation of his constitutional rights, Plaintiff suffered the injuries and damages set forth above.

122.    Defendants exercised deliberate indifference, failure to protect, a disregard for Plaintiff's safety, denial of medical attention, cruelty, extreme recklessness, and intent to known and probable risks to Plaintiff by failing to take remedial action and allowing a dangerous environment to become so pervasive on the RCTP by allowing the abuse, attacks and dangerous conditions to exist.

123.    The individual Defendants, Defendants CO DOES and Defendants Medical Provider DOES were aware of a risk to the life and safety of Plaintiff and failed to act and/or acted improperly, in deliberate indifference to Plaintiff's federally-protected constitutional rights.

124.    Accordingly, the individual Defendants, Defendants CO DOES and Defendants Medical Provider DOES violated the 8th Amendment because they acted with deliberate indifference to the health and well-being of Plaintiff.

125.    The individual Defendants, Defendants CO DOES and Defendants Medical Provider DOES had the power to prevent or aid in preventing the commission of said wrongs, could have done so by reasonable diligence, and knowingly, recklessly, or with deliberate indifference and callous disregard for Plaintiff's rights failed or refused to do so.

126.    The individual Defendants, Defendants CO DOES and Defendants Medical Provider DOES failed to comply with DOCCS policies and/or directives concerning adequate supervision and/or protecting incarcerated individuals from violent assaults.

127.    Defendants also failed to provide adequate medical treatment in a timely fashion and refused to ensure that Plaintiff received the proper treatment.

128.    The individual Defendants, Defendants CO DOES and Defendants Medical Provider DOES were objectively aware of the serious risk of harm should Plaintiff not receive medical treatment and violated contemporary standards of decency by denying him timely and adequate medical treatment.

11

129.    Defendants determined Plaintiff to have objectively serious medical needs.

130.    The unlawful conduct of Defendants was willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed.

131.    As a direct and proximate result of the deprivation of his constitutional rights, Plaintiff JERMAINE LAMB suffered the injuries and damages set forth above.

## THIRD CAUSE OF ACTION
### 42 U.S.C. § 1983 (Failure to Intervene)

132.    Plaintiff realleges and incorporates by reference each allegation set forth in the foregoing paragraphs as if fully set forth herein.

133.    Defendants were under a duty of safeguarding the public and ensuring the appropriate execution of each and every Defendant's role.

134.    Plaintiff duly relied on Defendants' fulfillment of their duties.

135.    The individual Defendants, Defendants CO DOES and Defendants Medical Provider DOES had an affirmative duty to intercede when Plaintiff's constitutional rights were being violated in Defendants' presence.

136.    At the time of the incidents, Defendants were observing and aware of the wrongful acts against Plaintiff.

137.    At the time of the incident, Defendants neglected to intervene on Plaintiff's behalf in dereliction of their duty to Plaintiff and in deliberate indifference to Plaintiff's well-being.

138.    Defendants violated Plaintiff's constitutional rights when they failed to intercede and prevent the violation or further violation of Plaintiff's constitutional rights and the injuries or further injuries caused as a result of said failure.

139.    Defendants had an affirmative duty to intercede when Plaintiff's constitutional rights were being violated in Defendants' presence by assault, abuse and punishments.

140.    Defendants had reason to know that the Plaintiff was under attack and had extended opportunities to stop or otherwise mitigate it.

141.    As a direct and proximate result of the deprivation of his constitutional rights, Plaintiff JERMAINE LAMB suffered the injuries and damages set forth above.

## FOURTH CAUSE OF ACTION
### Title II of the American with Disabilities Act, 42 U.S.C. §§ 12131-34 and
### Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794
### as Against Defendant DOCCS [9]

142. Plaintiff realleges and incorporates by reference each allegation set forth in the foregoing paragraphs as if fully set forth herein.

143. Defendant NEW YORK STATE DEPARTMENT OF CORRECTIONS AND COMMUNITY SUPERVISION, acting through its agents, violated Plaintiff's rights guaranteed by the Americans with Disabilities Act and the Rehabilitation Act.

144. Plaintiff is a qualified individual under the ADA.

145. Plaintiff is an individual with disabilities as defined by Executive Law § 292 (21).

146. The lack of accommodations to Plaintiff were not reasonable, especially but not limited during the months, days and hours leading up to Plaintiff's allegations which form the basis of this lawsuit.

147. There was a reasonable level of accommodation available but it was not provided to Plaintiff during that period.

148. By failing to follow the prescribed guidelines for mental health conditions, disciplining and abusing Plaintiff because of his mental health symptoms and failing to provide Plaintiff with his required mental health care, medication and encounters, among other programs, Plaintiff was denied access to and discriminated against due to his mental health conditions.

149. On information and belief, the prescribed guidelines for mental health conditions were adhered to for other incarcerated people.

150. By reason of the State of New York's acts and omissions, Plaintiff endured substantial physical and emotional injuries, including permanent physical and emotional damage, and was otherwise damaged and injured.

151. As a direct and proximate result of the deprivation of his constitutional rights, Plaintiff JERMAINE LAMB suffered the injuries and damages set forth above.

## DEMAND FOR RELIEF

**WHEREFORE**, Plaintiff demands the following relief against Defendants, jointly and severally:

(a)    compensatory damages in an amount just and reasonable and in conformity with the evidence at trial;

---

[9] This is the only Cause of Action against DOCCS.

13

(b)     punitive damages to the extent allowable by law;

(c)     attorney's fees;

(d)     the costs and disbursements of this action;

(e)     interest; and

(f)     such other and further relief as this Court deems just and proper.

Dated: New York, New York
      January 28, 2026

Yours, etc.

Ellie A. Silverman, Esq.
Ellie Silverman Law P.C.
*Attorneys for Plaintiff*
JERMAINE LAMB
745 5th Avenue, Suite 500
New York, New York 10151

14